IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BENNIE MAESTAS and RAY HORT,

        Plaintiffs,

v.                                          No. CIV 02-1052  JP/RLP

DAVID A. SEGURA, in his individual capacity,
DENNIS PRATT, in his individual capacity, the
CITY OF ALBUQUERQUE and MARTIN CHAVEZ,
Mayor of Albuquerque,

        Defendants.

## MEMORANDUM OPINION AND ORDER

On October 24, 2003, Defendants filed a Motion for Summary Judgment (Doc. No. 35) seeking dismissal of Plaintiffs= claims against all Defendants.  Having carefully reviewed the briefs, the case law, and the evidence in the record, this Court will grant Defendants= Motion for Summary Judgment.

**I.**      **Background**

The Court will view the facts in the light most favorable to the plaintiffs.  See EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1189 (10th Cir. 2000).  The following are the facts, established by admissible evidence, that most favor Plaintiffs. Plaintiffs Bennie Maestas and Ray Hort are employees of the City of Albuquerque Solid Waste Management Department ("SWMD").  Defendant David A. Segura is the Director of SWMD.  Defendant Dennis Pratt is

the Superintendent of SWMD's Vehicle Maintenance Division.  Defendant Martin Chavez, as
Mayor of the City of Albuquerque, has ultimate oversight over SWMD.

        In their original complaint, Plaintiffs Maestas and Hort sued Defendants Segura, Pratt,
Mayor Chavez, and the City of Albuquerque, alleging that Defendants violated Plaintiffs'
constitutional rights to exercise free speech on matters of public concern.  In Count I of the
complaint, Plaintiffs assert that Defendants, acting under color or authority of law, intentionally
violated Plaintiffs' free speech rights under the United States Constitution and the Constitution of
the State of New Mexico in contravention of 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983.

        A.      Plaintiff Bennie Maestas

        Unless otherwise noted, the following material facts are undisputed.  Plaintiff Bennie
Maestas has worked at SWMD since 1994. Def. Mem. (Doc. No. 36) Ex. A at 6.  At all times
since his employment began at SWMD, Mr. Maestas' position has been classified as a "Materials
Manager." Id. at 7, 33.  During the course of his employment at SWMD, Mr. Maestas has been
assigned to work in various divisions, including the Central Services Division and the Vehicle
Maintenance Division.  Id. at 8-9.  Mr. Maestas has been required to perform different duties in
each of his different assignments at SWMD. Id. at 33.  The assignment that Mr. Maestas presently
holds is manager of refuse carts and bins.  Id. at 5.

        During the course of his employment, Mr. Maestas has discovered what he believes to be
various improprieties and misuses of public funds at SWMD.  Id. at 41.  Beginning as early as
1997 and continuing through early 2002, Mr. Maestas periodically reported his discoveries to City
of Albuquerque internal auditors, members of the Albuquerque City Council, and members of the
local news media. Id. at 44-45, 54, 62-65, 67, 75.  Mr. Maestas also reported his concerns to

2

colleagues and supervisors at SWMD, including Mr. Pratt and Mr. Segura.  Id. at 46, 48-49, 51,

62-63.  Mr. Maestas claims that his speech relating to the these alleged improprieties and misuses

of public funds motivated Defendants to take retaliatory actions against him that are the basis of

this lawsuit. Plf. Mem. (Doc. No. 39) Ex. T at 3.

 Mr. Maestas' speech regarding alleged improprieties at SWMD concerned the procedure

by which SWMD requested bid proposals for vehicles and equipment, and the quality of the

equipment and vehicles that were purchased by SWMD.  Mr. Maestas believes that many of

SWMD's requests for bid proposals were designed in such a way that only one vendor could

qualify for the contract.  Id. at 1.  Furthermore, according to Mr. Maestas, the vehicles and

equipment that SWMD purchased did not meet the specifications set forth in the bid contracts.

Id.  For example, Mr. Maestas asserts that a tire recycling machine purchased by SWMD did not

meet performance specifications and has never worked properly. Def. Mem. (Doc. No. 36) Ex. A

at 44.  In addition, Mr. Maestas maintains that tires purchased by SWMD were defective, and that

the hydraulic systems on a number of trash vehicles were not functioning property.  Id. at 76-78.

 Mr. Maestas' speech regarding alleged misuses of public funds concerned, among other

things, SWMD's over-payment for sub-standard equipment, and payment for repairs that should

have been covered by warranty.  Id. at 60, 67.  Mr. Maestas also determined that SWMD was

over-paying for trash collection vehicles that did not meet specifications.  Id. at 47.  According to

Mr. Maestas, SWMD has spent more than one million dollars on the purchase and maintenance of

one such trash collection vehicle.  Plf. Mem. (Doc. No. 39) Ex. T at 1.  In addition, Mr. Maestas

determined that between 1998 and 2001, SWMD paid more than $3 million for vehicle repairs

that should have been covered by warranty.  Def. Mem. (Doc. No. 36) Ex. A at 59-60.  In

response to Mr. Maestas' complaints, several audits of SWMD were performed by the city's

internal audit department.  Plf. Mem. (Doc. No. 39) Ex. T at 2.

     Mr. Maestas also engaged in political speech during the 2001 City of Albuquerque

mayoral elections by openly supporting the unsuccessful candidacy of Bob Schwartz.[1]  Def. Mem.

(Doc. No. 36) Ex. A at 35-36.  In November of 2001, Mr. Maestas had a conversation with Mr.

Pratt in which Mr. Maestas stated that he supported Bob Schwartz's candidacy.  Id.  Mr. Maestas

acknowledges that other SWMD employees also supported Bob Schwartz in the mayoral election.

Id.  At least one other Bob Schwartz supporter, Ernie Perea, has been promoted within SWMD

since the 2001 mayoral election.  Id. at 37.

     Mr. Maestas' supervisors were aware that Mr. Maestas had voiced concerns about

SWMD to City of Albuquerque internal auditors and members of the news media.  Def. Mem.

(Doc. No. 36) Ex. A at 46, 48-49.  At some point between 1997 and 2000, Mr. Pratt met with

Mr. Maestas and Mr. Hort to discuss the fact that they had spoken to the news media regarding

their concerns about SWMD.  Id. Ex. E at 63-67, 69-71.  In March or April of 2002, Mr. Segura

met with Mr. Maestas to inquire about a newspaper article that reported alleged improprieties at

SWMD.  Id. Ex. B at 34.  Mr. Segura asserts that he called the meeting with Mr. Maestas to

---

[1]  The only claim that Plaintiffs assert in their original complaint is a claim that Defendants have violated their First Amendment right to free speech.  Complaint (Doc. No. 1) at  8.  Since there is no claim for a violation of Plaintiffs' First Amendment right of political affiliation, Plaintiffs apparently introduce evidence of their political support for Bob Schwartz as further evidence that they engaged in protected speech. The Tenth Circuit has held that protected speech for purposes of a First Amendment claim includes any statement that can be "fairly considered as relating to any matter of political, social, or other concern to the community."  Moore v. City of Wynnewood, 57 F.3d 924, 932 (10th Cir. 1995).  Because Plaintiffs' vocal support for a mayoral candidate relates to a matter of political concern to the community, the Court finds that Plaintiffs' outspoken support for Bob Schwartz may constitute protected speech for purposes of their First Amendment claim.

inquire about why Mr. Maestas had not first brought these allegations to Mr. Segura's attention before speaking to the news media.  Id. at 34-35.

In January of 2002, Mr. Maestas submitted a letter to various city officials, including Mr. Segura, that he was being subjected to harassment and a hostile work environment in retaliation for raising concerns to internal auditors regarding the misuse of public funds at SWMD, and that he had received threats regarding his job security. Def. Mem. (Doc. No. 36) Ex. A at 131; Plf. Mem. (Doc. No. 39) Ex. S.  Mr. Maestas asserted in the letter that SWMD management personnel had informed him that he would be subjected to disciplinary action for speaking to internal auditors about alleged improprieties and misuse of public funds.    Def. Mem. (Doc. No. 36) Ex. A at 79, 133; Plf. Mem. (Doc. No. 39) Ex. S at 1.  Mr. Maestas acknowledges that none of the named Defendants in this lawsuit threatened him with disciplinary action.  Def. Mem. (Doc. No. 36) Ex. A at 79, 82-85.

Mr. Maestas contends that in early 2002, an SWMD employee, Tito Montoya, told him that he had overheard a conversation in which Mayor Chavez told Mr. Segura that there were enough votes on the city council to "get rid of" two SWMD employees.  Def. Mem. (Doc. No. 36) Ex. A at 113-14.  Mr. Maestas believes that the two employees that Mayor Chavez allegedly referred to are himself and Mr. Hort.  Id. at 115.  Mr. Montoya stated by affidavit that he has never overheard such a conversation between Mayor Chavez and Mr. Segura.  Id. Ex. C.  Mr. Montoya also stated that he did not tell Mr. Maestas that he had ever overheard such a conversation. Id.

Soon after Mayor Chavez took office in late 2001, Mr. Segura met with Mr. Pratt and other superintendents of SWMD to discuss possible solutions for reducing the SWMD budget.

Def. Mem. (Doc. No. 36) Ex. B at 28; Ex. E at 5.  The meeting was held in response to Mayor

Chavez's order that all city departments cut their budgets by ten percent. Id. Ex. B at 27-28.

After reviewing and identifying possible areas for budget cuts, Mr. Pratt recommended eliminating

four supervisor positions within the Vehicle Maintenance Division of SWMD.  Id. Ex. B at 22,

31; Ex. E at 8-11.  According to Mr. Pratt, the elimination of these four positions would have

resulted in a substantial reduction in the SWMD budget.  Id. Ex. E at 11.  Mr. Maestas and Mr.

Hort held two of the four positions that were proposed for elimination in the SWMD budget.  Id.

Ex. B at 57.  The third position proposed for elimination was held by Frank Ortega, while the

fourth position was vacant at that time. Id.  According to Mr. Pratt, the four supervisor positions

were no longer needed due to recent changes in the shift schedule and the assumption of

supervisory duties by other SWMD employees.  Id. Ex. B at 57-59; Ex. E at 8-10.  Mr. Segura

accepted Mr. Pratt's recommendation, and proposed to eliminate the four supervisor positions in

the final budget submitted to the city council. Id. Ex. B at 31, 54, 57-59.

On April 7, 2002, Mr. Maestas received official notification that his position at SWMD

was proposed for elimination in the budget that had been submitted to the Albuquerque City

Council. Id. Ex. A at 127.  The official notification expressly stated that it was not a lay-off

notice, and that the elimination of his position had merely been proposed. Id.  Soon thereafter,

Mr. Maestas attended a city council meeting and informed members of the city council about his

concerns regarding the proposed elimination of his position.  Id. at 128; Plf. Mem. (Doc. No. 39)

Ex. T at 2.  Subsequently, the Albuquerque City Council refused to approve the elimination of the

four supervisor positions in the final SWMD budget for fiscal year 2003.  Def Mem. (Doc. No.

36) Ex. B at 59.

After the city council declined to eliminate the four SWMD supervisor positions, Mr. Pratt met with Mr. Segura to discuss transferring the four supervisor positions to other divisions within SWMD.  Def. Mem. (Doc. No. 36) Ex. E at 21-25.  After discussing the relevant personnel needs within SWMD, Mr. Segura decided to re-assign Mr. Maestas to the Central Services Division to address a lack of inventory control identified by an internal audit.  Id. Ex. E at 22-24.  On April 16, 2002, Mr. Maestas was informed by memorandum from Mr. Segura that he was being transferred to the Central Services Division to oversee the residential refuse cart inventory.  Plf. Mem. (Doc. No. 39) Ex. L.  The memorandum stated that Mr. Maestas was being transferred to correct an inventory control weakness identified by an internal audit.  Id.

 Mr. Maestas believes that his present assignment as manager of refuse carts and bins is a demotion from his previous assignments at SWMD.  Def. Mem. (Doc. No. 36) at 141.  Mr. Maestas acknowledges that all of the duties he performs in his present assignment are included in the job description for "Materials Manager."  Id. at 35, 141. In his present assignment, Mr. Maestas directly supervises five employees.  Id. at 95.[2]  In his former assignment, Mr. Maestas

----

[2] In an affidavit submitted as exhibit T to Plaintiff's Memorandum, Mr. Maestas claims that he supervised six employees in his former assignment, while in his present assignment he supervises only one employee.  Plf. Mem. (Doc. No. 39) Ex. T at 4.  Defendants argue that because these affidavit statements directly contradict Mr. Maestas' prior statements made in deposition testimony, this Court should disregard the affidavit statements.  See Def. Mem. (Doc. No. 36) Ex. A at 24, 26, 86, 95.

A court will disregard an affidavit that conflicts with the affiant's prior sworn statements when the affidavit "constitutes an attempt to create a sham fact" issue."  Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1282 (10th Cir. 2003).  The Court in Burns held that the factors to be considered in determining whether an affidavit presents a sham issue are: 1) whether the affiant had been cross-examined during his earlier testimony; 2) whether the affiant had access to the pertinent evidence at the time of his earlier testimony; and 3) whether the earlier testimony reflects confusion which the affidavit attempts to explain.  Id. Applying the analysis articulated in Burns, this Court finds that Mr. Maestas was cross-examined at his deposition; that he had access to the pertinent information at his deposition; and that the answers given in his deposition do not reflect any confusion.  Accordingly, this Court will disregard Mr. Maestas' affidavit statements regarding the number of persons he supervises as an attempt to create a sham fact issue.

directly supervised only one employee.  Id. at 86.  When Mr. Maestas was initially transferred to

his present assignment, he was not provided with an office.  Id. at 88.  After making several

requests to his immediate supervisor, who is not a named defendant in this case, Mr. Maestas was

given an office.  Id. at 89-90.  Mr. Maestas acknowledges that he has not lost any salary or

benefits as a result of his transfer.  Id. at 141.  Mr. Maestas asserts that he has lost promotional

opportunities as a result of the transfer.  Id. at 83.  Mr. Maestas has not applied for any

promotions since his transfer.  Id.  Mr. Maestas asserts that he has experienced diminished job

satisfaction since his transfer, because he no longer performs functions such as purchasing and

compliance. Plf. Mem. (Doc. No. 39) Ex. T at 3.  In addition, Mr. Maestas contends that his

current assignment deprives him of the opportunity to review equipment purchases and

maintenance costs and therefore prevents him from monitoring and speaking out about alleged

improprieties and misuses of public funds at SWMD.  Id.

> B.   Plaintiff Ray Hort

Plaintiff Ray Hort has worked at SWMD since 1986.  Def. Mem. (Doc. No. 36) Ex. D at

4.  From 1986 until 2002, Mr. Hort worked in the Vehicle Maintenance Division of SWMD. Id.

at 5.  For approximately the past two years, Mr. Hort has held the position of Solid Waste

Supervisor.  Id. at 88.  Mr. Hort acknowledges that he was one of the least senior of any of the

Solid Waste Supervisors in the Vehicle Maintenance Division.  Id. Ex. D at 11.  Mr. Hort's

current assignment is to supervise the graffiti response crew in the Clean City Division of SWMD.

Id. at 4, 7.

Beginning in 1996 and continuing through 2002, Mr. Hort periodically voiced concerns to

his supervisors and to city internal auditors regarding improperly functioning equipment and

8

misuses of public funds at SWMD.  Id. at 28, 85, 95-96.  Mr. Hort's speech during this period included making allegations that the Vehicle Maintenance Division was purchasing parts at excessive cost.  Id. at 29-31, 44-45.  Mr. Hort also voiced concerns that SWMD equipment and vehicles, specifically front-loader garbage trucks, were not functioning properly.  Id. at 84-85.

In addition, Mr. Hort also engaged in political speech during the 2001 mayoral election by openly supporting Bob Schwartz, who was later defeated in the election by Mayor Chavez.  Id. at 103. Around November of 2001, Mr. Hort candidly discussed his political support for Bob Schwartz with Mr. Pratt.  Id. at 103-05.

Like Mr. Maestas, Mr. Hort held one of the four supervisor positions that were proposed for elimination in the SWMD budget submitted to the Albuquerque City Council in early 2002. Id. Ex. B at 57.  According to Mr. Segura, Mr. Hort would not have been laid off from SWMD even if the city council had approved the elimination of his position.  Id. at 62-63.  In January of 2002, Mr. Pratt assured Mr. Hort that he would not lose his job. Id. at 81.  Despite these assurances, that same month, Mr. Hort sent to Mr. Segura and various other city officials a letter claiming that Mr. Hort had been subjected to harassment and a hostile work environment for raising concerns with internal auditors about improprieties and the misuse of public funds, and that he had received threats regarding his job security.  Id. Ex. D at 70.

In April of 2002, after the Albuquerque City Council declined to approve the elimination of Mr. Hort's position, Mr. Segura met with Mr. Pratt to discuss re-assigning Mr. Hort to fill a more valuable personnel need within SWMD.  Id. Ex. E at 22-25.  Mr. Segura chose to re-assign Mr. Hort to the Clean City Division to be in charge of the graffiti response plan, a project that was a priority for Mayor Chavez. Id. Ex. E at 24.

On April 16, 2002, Mr. Segura sent a memorandum to James Lewis, Chief Operations Officer, proposing to establish a graffiti removal program to address Mayor Chavez's request that SWMD expedite its responses to graffiti complaints.  Id. Ex. D at Ex. 2.  In the memorandum, Mr. Segura requested permission from Mr. Lewis to transfer Mr. Hort to participate in development and planning of the new graffiti program. Id.  On April 16, 2002, Mr. Hort was notified by memorandum from Mr. Segura that he was being transferred to his current assignment in the Clean City Division of SWMD.  Plf. Mem. (Doc. No. 39) Ex. M.  Mr. Segura stated in the memorandum that the reason for Mr. Hort's re-assignment was to oversee the graffiti response plan requested by Mayor Chavez.  Id.

Mr. Hort asserts that he was transferred to the Clean City Division in retaliation for his "whistle-blowing" activities.  Def. Mem. (Doc. No. 36) Ex. D at 7.  Mr. Hort acknowledges that the duties he currently performs are included in the job description for Solid Waste Supervisor. Id. at 86-87.  In his current position, Mr. Hort supervises five employees.  Id. at 13.  When he was initially transferred to his current assignment, Mr. Hort was not provided with a vehicle for use in his job.  Id. at 89-90.  Mr. Hort acknowledges that none of the named Defendants are directly responsible for assigning vehicles to employees.  Id.  Mr. Hort asserts that as a result of the transfer to his current assignment, he has lost income because he no longer has opportunities to earn overtime pay on holidays.  Id. at 13-14.  Mr. Hort has not applied for any other jobs within SWMD since his transfer.  Id. at 15.  Like Mr. Maestas, Mr. Hort contends that in his present assignment, he is no longer able to monitor and speak out about alleged improprieties and misuses of public funds at SWMD.  Plf. Mem. (Doc. No. 39) Ex. U at 1.

## II.      Standard of Review

Summary judgment is appropriate if there is no genuine issue of material fact and the

moving party is entitled to summary judgment as a matter of law.  FED. R. CIV. P. 56(c).  When

applying this standard, the Court examines the factual record and reasonable inferences therefrom

in the light most favorable to the party opposing summary judgment.  Applied Genetics Int'l, Inc.

v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The moving party bears the

initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward

with evidence showing that there is a genuine issue of material fact.  Bacchus Indus., Inc. v. Arvin

Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

An issue of material fact is genuine if a reasonable jury could return a verdict for the non-

movant.  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  The non-moving party may not

avoid summary judgment by resting upon the mere allegations or denials of the party's pleadings.

Bacchus, 939 F.2d at 891.  To withstand a motion for summary judgment, the non-movant must

make specific reference to admissible evidence in the record.  See Gross v. Burggraf Constr. Co.,

53 F.3d 1531, 1546 (10th Cir. 1995).  Unsubstantiated allegations, no matter how true they might

be, cannot be considered.  See Id.

## III.     Discussion

### A.      Plaintiffs' First Amendment Claim Against Defendants Pratt and Segura

Defendants argue that Defendants Segura and Pratt are entitled to qualified immunity on

Plaintiffs' First Amendment claim against them, which should be dismissed.  The doctrine of

qualified immunity protects Defendants from the burden of litigation unless Plaintiffs can show

that Defendants violated a clearly established constitutional right so that reasonable officials would have understood that their conduct violated that right. <u>See</u> <u>Dill v. City of Edmond</u>, 155 F.3d 1193, 1204 (10th Cir. 1998) (<u>citing</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Thus, this Court must first determine whether Plaintiffs have shown sufficient facts that, if proven, would clearly constitute a First Amendment free speech claim. If the Plaintiffs have presented sufficient facts to show that their First Amendment right to free speech was violated, then the Court must determine whether the constitutional right was clearly established so that reasonable officials would have understood that their conduct violated that right. <u>See</u> <u>Dill</u>, 155 F.3d at 1204 (<u>citing</u> <u>Albright v. Rodriguez</u>, 51 F.3d 1531, 1534-35 (10th Cir. 1995)).

At the time of the alleged violation, the law was clear that a public employer may not retaliate against an employee for exercising his First Amendment right to free speech. <u>See</u> <u>Dill</u>, 155 F.3d at 1201 (<u>citing</u> <u>Connick v. Myers</u>, 461 U.S. 138, 142 (1983)). To determine whether a public employer has violated an employee's constitutionally protected right to free speech, this Court will apply the four-step analysis established by the Supreme Court in <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968). <u>See</u> <u>Burns</u>, 330 F.3d at 1285-86.

In applying the <u>Pickering</u> analysis, the Court first determines whether the employee's speech touches on a matter of public concern. <u>Id.</u> at 1285 n. 7. If so, then the Court decides whether the employee's interest in commenting on matters of public concern outweighs the state's interest in promoting the efficiency of the public service it performs through its employees. <u>Id.</u> Next, the employee must show that the protected speech was a substantial or motivating factor behind the detrimental employment decision. <u>Id.</u> If these factors are met, then the burden shifts to the employer to establish that it would have reached the same decision in the absence of the

protected speech.  Id.  The first two steps of the Pickering analysis are determined as a matter of

law while the last two steps involve questions of causation and are therefore questions of fact.

Hulen v. Yates, 322 F.3d 1229, 1237 (10th Cir. 2003).   For purposes of their Motion for

Summary Judgment, Defendants concede that the first two steps of the Pickering test have been

met. Def. Mem. (Doc. No. 36) at 15.

      i.     Substantial or Motivating Factor

      With respect to the third step of the Pickering analysis, Defendants argue that Plaintiffs

have presented no evidence that the protected speech was a substantial or motivating factor

behind the alleged adverse employment decisions.  Plaintiffs respond by arguing that the close

proximity in time between Plaintiffs' protected speech and Defendants' adverse employment

decisions is sufficient evidence that Defendants' actions were made in retaliation to Plaintiffs'

protected speech.

      The Tenth Circuit has noted that proof of a retaliatory motive in the context of the

Pickering analysis turns on the defendant's state of mind, and is therefore particularly difficult to

establish by direct evidence.  See Ramirez v. Okla. Dep't of Mental Health, 41 F.3d 584, 596

(10th Cir. 1994).  Accordingly, courts permit a plaintiff to establish proof of a retaliatory motive

by circumstantial evidence.  Id.  The Tenth Circuit has held that proof of the underlying

circumstances and a close temporal proximity between the exercise of a plaintiff's First

Amendment rights and the adverse actions taken by the defendant could reasonably support an

inference of an unlawful retaliatory motive.  Id.  In Ramirez, the Tenth Circuit held that a one and

a half month period between the plaintiff's protected speech and the action taken against the

plaintiff was sufficiently probative of the defendant's retaliatory motive to withstand a motion for

summary judgment.  Id.  By contrast, the Tenth Circuit has held that a three month period of time

between a plaintiff's protected activity and a defendant's adverse employment decision, standing

alone, is insufficient to establish a retaliatory motive.  See Richmond v. Oneok, Inc., 120 F.3d

205, 209 (10th Cir. 1997).

Viewing the evidence in the light most favorable to Plaintiffs, there is sufficient evidence

of a close temporal proximity between Plaintiffs' protected speech and Defendants' adverse

employment actions such that a fair-minded jury could determine that Plaintiffs' speech was a

motivating factor behind Defendants' actions.  In November of 2001, Plaintiffs had  conversations

with Defendant Pratt regarding their political support for Bob Schwartz in the 2001 City of

Albuquerque mayoral elections.  Def. Mem. (Doc. No. 36) Ex. A at 35-36; Ex. D at 103-105.

Approximately one month later, in December of 2001, Defendant Pratt met with Defendant

Segura and recommended eliminating Plaintiffs' positions in the proposed SWMD budget.  Id.

Ex. B at 28; Ex. E at 5.  Then, in April of 2002, Mr. Maestas engaged in protected speech at a

city council meeting in which he protested the proposed elimination of his position.  Later that

month, Defendants Segura and Pratt met again to discuss re-assigning Plaintiffs to other positions

within SWMD.  Id. Ex. E at 21-25.  Thus, on account of the underlying circumstances and the

close proximity in time between incidents of protected speech and the adverse employment

decisions, Plaintiffs have established by circumstantial evidence that the protected speech was a

substantial or motivating factor behind Defendants' actions.

14

ii.      Adverse Employment Decision

Defendants assert that the actions they took against Plaintiffs - namely, the decision to eliminate Plaintiffs' positions in the proposed SWMD budget and the subsequent decision to re-assign Plaintiffs within SWMD - do not constitute adverse employment actions for purposes of a First Amendment retaliation claim.[3]

The Tenth Circuit has noted that the Pickering analysis contains an implicit requirement that the public employer have taken some adverse employment action against the employee.  See Belcher v. City of McAlester, 324 F.3d 1203, 1207 n. 4 (10th Cir. 2003).  If the action taken by the employer in response to the protected speech is inconsequential or has only speculative consequences, such action does not constitute an adverse employment action.  See Id.  Yet, it is well-settled in the Tenth Circuit that a detrimental employment action necessary to sustain a First Amendment claim can be short of an actual or constructive discharge.  See Dill, 155 F.3d at 1204-05; see also Morfin v. Albuquerque Public Schools, 906 F.2d 1434, 1437 (10th Cir. 1990).  Accordingly, the Tenth Circuit has noted that decisions regarding promotion, transfer, and a recall

---

[3]  In the original complaint, Plaintiffs assert that the adverse actions taken against them by Defendants include: 1) threatening disciplinary actions, including threats to fire Plaintiffs; 2) attempting to fire Plaintiffs by "de-appropriating" their jobs; 3) transferring Plaintiffs to menial duties including duties outside their job specification; 4) depriving Plaintiffs of all staff and supervisory duties; 5) isolating Plaintiffs and making humiliating and denigrating statements about them; 6) assigning Mr. Maestas to much less desirable office space; 7) giving Mr. Maestas impossible tasks to perform in impossible time frames; 8) depriving Mr. Maestas of a computer and other office equipment necessary to perform his new duties; 9) transferring Mr. Hort to the Graffiti division even though he is trained and has years of experience as a mechanic and supervisor of mechanics; 10) depriving Mr. Hort of the means to perform his new duties; 11) depriving Mr. Hort of opportunities to earn overtime pay; 12) denying Plaintiffs promotional opportunities.  Complaint (Doc. No. 1) at 7-8.  To simplify the analysis of whether any of these alleged actions constitutes an adverse employment decision, the Court will classify these alleged actions as falling within one of two categories: 1) the decision to eliminate Plaintiffs' positions; and 2) the decision to transfer Plaintiffs within SWMD.

after layoff are all potentially actionable adverse employment decisions when made in retaliation

for the exercise of a protected right to engage in free speech.  See Schuler v. City of Boulder, 189

F.3d 1304, 1309 (10th Cir. 1999).

Several recent Tenth Circuit decisions illustrate the nature and type of decisions that can

constitute adverse employment actions for purposes of a First Amendment claim.  In Belcher v.

City of McAlester, the plaintiff city firefighter alleged that defendants had issued him a written

reprimand and threatened him with dismissal in retaliation for exercising his right to engage in

protected speech.  324 F.3d at 1205.  In that case, the defendants argued that their actions against

the plaintiff did not rise to the level of an actionable adverse employment action.  Id. at 1207. The

Court in Belcher disagreed, holding that a retaliatory reprimand and threat of dismissal may

constitute adverse employment action for purposes of a First Amendment claim.  Belcher, 324

F.3d at 1207 (citing Rutan v. Republican Party of Ill., 497 U.S. 62, 64 (1990)).

In Schuler v. City of Boulder, the plaintiff, a former city recreation center employee,

alleged that in retaliation for exercising her right to engage in protected speech, defendants,

among other things, deprived her of certain job duties that she had previously held, and

involuntarily transferred her to another job location. 189 F.3d at 1306-07.  Notably, the plaintiff's

transfer did not affect her title, compensation, or duties. Id. at 1307.  The Court in Schuler, noting

earlier decisions in which deprivations less harsh than dismissal were found to violate a plaintiff's

First Amendment rights, held that the defendants' alleged conduct against the plaintiff constituted

an actionable adverse employment decision. See Id. at 1310.

In Dill v. City of Edmond, the plaintiff police officer alleged that in retaliation for exercising his right to engage in protected speech, he was transferred from detective to patrol officer, and his work schedule was involuntarily adjusted to deprive him of weekend days off. 155 F.3d at 1200-01.  The plaintiff's transfer did not result in a change to his base salary, but it did deprive him of approximately $50 per month in "special duty pay."  Id. at 1200.  Finding that an action short of discharge may violate an employee's First Amendment rights, the Court in Dill held that the plaintiff's alleged transfer and change in work schedule fell "within the ambit of unconstitutional detrimental action."  Id. at 1205.

Under the holdings in Belcher, Schuler, and Dill, it is clear that the actions that Defendants allegedly committed against Plaintiffs in this case constitute adverse employment actions for purposes of a First Amendment claim. Like the plaintiff in Belcher, Plaintiffs assert that they were threatened with discharge when Defendants proposed to eliminate Plaintiffs' positions in the SWMD budget.  Like the plaintiffs in Schuler and Dill, Plaintiffs allege that they were involuntarily transferred to other assignments and deprived of job duties that they had once held. In light of the facts alleged and the preexisting case law, the Court concludes that the alleged actions taken by Defendants against Plaintiffs do constitute adverse employment action for purposes of a First Amendment claim.

Defendants cite a number of Tenth Circuit cases to support their argument that the actions allegedly taken against Plaintiffs do not rise to the level of adverse employment actions.  See Wells v. Colo. Dep't of Transp., 325 F.3d 1205, 1214 (10th Cir. 2003) (threat to transfer plaintiff held not to be an adverse employment action); Heno v. Sprint/United Mgmt. Co., 208 F.3d 847,

857 (10th Cir. 2000) (holding that moving plaintiff's desk, monitoring plaintiff's calls, acting

"chilly" towards plaintiff, and suggesting that plaintiff move to different department did not rise to

level of adverse employment action); Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir.

1998) (holding that involuntary transfer of plaintiff to another school, when plaintiff's salary and

benefits remained the same, was not an adverse employment action).        However, the cases

cited by Defendants are distinguishable because they all concerned adverse employment actions

for purposes of a Title VII employment discrimination claim, rather than a First Amendment

claim. As evidenced by the holdings in Belcher, Schuler, and Dill, all of which were decided

during the same period as the Title VII cases cited by Defendants, the Tenth Circuit uses different

criteria to determine whether an employment action is adverse for purposes of a First Amendment

claim than for purposes of a Title VII claim. See, e.g., Belcher, 324 F.3d at 1207 (noting that a

plaintiff may be subjected to adverse employment action for purposes of a First Amendment claim

when that action has a chilling effect on the plaintiff's exercise of free speech). Accordingly, the

cases cited by Defendants are inapposite, and Plaintiffs have established that the alleged actions

taken against them constitute adverse employment actions.

     iii.     Defendants Would Have Taken the Same Action in the Absence of Speech

     Since the first three steps of the Pickering analysis have been met, the burden shifts to

Defendants to show that they would have made the same employment decisions in the absence of

Plaintiffs' protected speech. Burns, 330 F.3d at 1285 n. 7. The Court finds that Defendants have

carried their burden by providing ample, uncontroverted evidence that there were legitimate, non-

discriminatory business reasons behind the decisions to propose the elimination of Plaintiffs'

positions and to transfer Plaintiffs to other assignments within SWMD.

      Defendants have provided evidence that in late 2001, Mayor Chavez ordered all city

departments, not just SWMD, to reduce their budgets by ten percent.  Def. Mem. (Doc. No. 36)

Ex. B at 27-28.  After reviewing possible areas for budget cuts, Mr. Pratt determined that recent

changes in shift schedules and the assumption of supervisory duties by other SWMD employees

obviated the need for four supervisor positions within the Vehicle Maintenance Division.  Id. Ex.

B at 22, 31; Ex. E at 8-11.  Mr. Pratt asserts that SWMD would have saved a significant amount

of money by eliminating these four supervisor positions.  Id. Ex. E at 11.   While Plaintiffs held

two of the four positions proposed for elimination, one of the other positions was held by another

SWMD employee, Frank Ortega.  Id. Ex. B at 57.  There is no evidence that Mr. Ortega ever

engaged in any protected speech or activity.

      Once the city council declined to approve the elimination of Plaintiffs' positions, Mr. Pratt

and Mr. Segura met to determine whether the positions that had been proposed for elimination

could be re-assigned to address more immediate personnel needs within SWMD.  Id. Ex. E at 21-

25.  Mr. Maestas was re-assigned to oversee the refuse bin and cart inventory, which is an area

that had been identified in an internal audit as needing personnel attention.  Plf. Mem. (Doc. No.

39) Ex. L.  Mr. Hort was re-assigned to participate in the development of a graffiti response

program, which had been identified by Mayor Chavez as a priority within SWMD.  Id. Ex. M.

This evidence presented by Defendants is sufficient to show that these legitimate, non-

discriminatory business reasons would have compelled Defendants to make the same employment decisions regarding the Plaintiffs even in the absence of the protected speech.

Plaintiffs attempt to discredit the business reasons offered by Defendants by arguing that SWMD is a self-sufficient "enterprise fund" that was not required to reduce its budget.   Plf. Mem. (Doc. No. 39) at 16-17.  Plaintiffs further assert that SWMD actually had a budget surplus at the time that Plaintiffs' positions were proposed for elimination. Id.  However, Plaintiffs have presented no competent evidence from which a reasonable fact-finder could conclude that Defendants' business reasons were disingenuous or pretextual.[4]  Accordingly, the Court finds that there is no genuine issue of material fact concerning whether Defendants would have made the same employment decision in the absence of Plaintiffs' protected speech.

Since Defendants have met their burden under the fourth step of the Pickering analysis, Plaintiffs are unable to show that Defendants Pratt and Segura violated Plaintiffs' First Amendment right to free speech.  Defendants Pratt and Segura are, therefore, entitled to the

---

[4] Plaintiffs' submit Exhibit P to their memorandum as evidence of SWMD's status as an "enterprise fund" and SWMD's supposed budget surplus. Plf. Mem. (Doc. No. 39) Ex. P. Defendants object that Plaintiffs' Exhibit P is an unauthenticated memorandum that contains hearsay.  Def. Reply Mem. (Doc. No. 42) at 3.

In ruling on a motion for summary judgment, a court may only consider admissible evidence.  World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985). The Court deems Plaintiff's Exhibit P inadmissible on the grounds that it is unauthenticated and contains hearsay.  Accordingly, the Court will not consider the information in Plaintiffs' Exhibit P in ruling on Defendants' Motion for Summary Judgment.  Even if the Court were to consider it, Defendants correctly point out that the statements contained in Exhibit P reveal that SWMD experienced a mid-year revenue shortfall at the time in question, a fact which would support Defendants' business reasons for proposing to eliminate Plaintiffs' positions.  Id. at 3.

defense of qualified immunity on Plaintiffs' First Amendment claim.  Defendants' Motion for

Summary Judgment will be granted with respect to Plaintiffs' claims against Defendants Pratt and

Segura.

      B.      Plaintiffs' First Amendment Claim Against Defendants Mayor Chavez and the

                City of Albuquerque

       Defendants correctly argue that Plaintiffs have not presented sufficient evidence to show

that Defendant Mayor Chavez took any action against Plaintiffs in violation of their First

Amendment right to free speech.  The only information put forward by Plaintiffs regarding Mayor

Chavez's involvement in the adverse employment decisions against Mr. Maestas is the alleged

conversation between Mayor Chavez and Mr. Segura, which another SWMD employee, Tito

Montoya, supposedly reported to Mr. Maestas.  Def. Mem. (Doc. No. 36) Ex. A at 113-14. Mr.

Montoya now denies ever having overheard such a conversation, and denies ever discussing such

a conversation with Mr. Maestas.  Id. Ex. C.  Plaintiffs have not presented any evidence that

Mayor Chavez was involved in any of the adverse employment decisions against Mr. Hort.

       Mr. Maestas' testimony regarding Mayor Chavez's involvement in this matter is based

entirely on a disavowed hearsay statement and therefore is insufficient to create a genuine issue of

material fact.  See Burns, 330 F.3d at 1281 ("The mere existence of a scintilla of evidence in

support of the nonmovant's position is insufficient to create a dispute of fact that is genuine. . .").

Since Plaintiffs have not shown that Mayor Chavez was in any way involved in the adverse

employment decisions taken against Plaintiffs, the Court will grant Defendants' Motion for Summary Judgment with respect to the claim against Mayor Chavez.

Plaintiffs' claim against Defendant City of Albuquerque is dependent upon a finding that a city employee violated Plaintiffs' constitutional rights.  See Ledbetter v. City of Topeka, 318 F.3d 1183, 1189 (10th Cir. 2003).  Since this Court will grant summary judgment in favor of all of the city employee defendants, summary judgment in favor of Defendant City of Albuquerque is also proper, as there is no longer any basis for finding municipal liability.


THEREFORE it is ORDERED that Defendants' Motion for Summary Judgment is GRANTED.



_____
SENIOR UNITED STATES DISTRICT JUDGE